AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. 3:19 mj-656 |
| | ) | |
| NATHAN GODDARD | ) | SHARON L. OVINGTON |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __November 4, 2019__ in the county of __Montgomery__ in the __Southern__ District of __Ohio__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|

SEE ATTACHMENT A

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

SA CHARLES A. VILL, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11-5-19

_____
*Judge's signature*

City and state: DAYTON, OHIO    SHARON L. OVINGTON, U.S. MAGISTRATE JUDGE
*Printed name and title*

## ATTACHMENT A
### COUNT 1
### [18 U.S.C. §§ 111(a)(1) and (b); and 1114]

On or about November 4, 2019, in the Southern District of Ohio, the defendant, **NATHAN GODDARD**, intentionally and forcibly assaulted a federal officer using a deadly or dangerous weapon and inflicted bodily injury, while the federal office was engaged in the performance of his official duties.

In violation of 18 U.S.C. §§ 111(a)(1) and (b); and 1114.

### COUNT 2
### [21 U.S.C. § 846]

Beginning on an exact date unknown, but at least by on or about November 4, 2019, in the Southern District of Ohio, the defendant, **NATHAN GODDARD**, knowingly and intentionally conspired with others, whose identities are both known and unknown, to possess with intent to distribute 400 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi), 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii), and a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D).

All in violation of 21 U.S.C. § 846.

### COUNT 3
### [18 U.S.C. § 924(c)(1)(A)(iii)]

On or about November 4, 2019, in the Southern District of Ohio, the defendant, **NATHAN GODDARD**, knowingly discharged a firearm during and in relation to a drug trafficking crime, namely the crime charged in Count 2.

In violation of 18 U.S.C. § 924(c)(1)(A)(iii).

## AFFIDAVIT

Now comes Charles A. Vill, Special Agent, Drug Enforcement Administration ("DEA"), being duly sworn, deposes and states the following:

1. I am an "Investigative or Law Enforcement Officer" of the DEA within the meaning of Title 21, United States Code, Section 878. Therefore, I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21 of the United States Code.

2. I am a Special Agent with the United States Drug Enforcement Administration (DEA). I have been employed as a Special Agent with the DEA since August 2016. In September 2016, I attended the DEA Academy which consisted of 20 weeks of training in conducting federal drug trafficking investigations, handling confidential sources, conducting undercover operations, conducting mobile, static, foot and electronic surveillance, conducting tactical entry and vehicle arrest operations, defensive tactics, firearms, and additional aspects of conducting DEA lead investigations. I have been assigned to the DEA Dayton Resident Office since April 2017. Prior to employment with the DEA, I was a sworn Law Enforcement Officer of the State of Georgia who was charged with the duty to investigate criminal activity and enforce the criminal laws of the State of Georgia, and employed by the Cobb County Police Department from December 2011 to August 2016. During my employment with the Cobb County Police Department, I was assigned to the Marietta-Cobb-Smyrna Organized Crime Task Force Intelligence Unit (MCS Intelligence). For approximately two years (2012-2014), I was assigned to the Cobb County Police Precinct 3 Morning Watch. I was then assigned to MCS Intelligence from April 2014 to August 2016. My duties included investigations of violations of the Georgia Controlled Substances Act, Murder for Hire, Extortion, Prostitution and Pimping, Human Trafficking, and Criminal Street Gangs.

3. Since the time of my assignment with the DEA, I have been involved in narcotics-related arrests, executed search warrants that resulted in the seizure of narcotics, and participated in undercover narcotics purchases. Through training and experience, I am familiar with the manner in which persons involved in the illicit distribution of controlled substances often operate. These people usually attempt to conceal their identities, as well as the locations at which they reside, and where they store controlled substances and the illegal proceeds derived.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrants and does not set forth all of my knowledge about this matter.

5. This affidavit is submitted in support of an application for criminal complaint against, and arrest warrants for, **Nathan GODDARD**, **Cahke CORTNER**,

and **Lionel COMBS III**. Based on the information stated below, I submit that there is probable cause to believe that **GODDARD** committed violations of:

    a. 18 U.S.C. §§ 111(a)(1) and (b); and 1114, namely, assaulting a federal officer using a deadly or dangerous weapon and inflicting bodily injury;

    b. 21 U.S.C. §§ 846 and 841(b)(1)(A), namely, conspiracy to possess with intent to distribute 400 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled substance, 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, and a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance; and

    c. 18 U.S.C. § 924(c)(1), namely, use of a firearm that is discharged in furtherance of a drug trafficking crime.

I submit that there is also probable cause to believe that **CORTNER** and **COMBS** committed violations of:

    a. 21 U.S.C. §§ 846 and 841(b)(1)(A), namely, conspiracy to possess with intent to distribute 400 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled substance, 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, and a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance; and

    b. 18 U.S.C. § 924(c)(1), namely, use of a firearm that is discharged in furtherance of a drug trafficking crime.

## PROBABLE CAUSE

    6. Between the period of mid-July 2019 and late October 2019, the DEA Dayton Resident Office conducted an investigation into a Dayton, Ohio based fentanyl trafficking organization. During this investigation, investigators cultivated a cooperating defendant (CD), who provided information to the DEA for consideration as to possible charges and sentences related to drug trafficking. The CD stated that **GODDARD** was the CD's drug source of supply. The CD stated that he/she obtained approximately one pound of marijuana from **GODDARD** on or about November 3, 2019. The CD stated that this transaction occurred in the basement of 1454 Ruskin Road, Dayton, Ohio. The CD stated that, during this transaction, the CD observed approximately ten kilograms of drugs in the basement of the residence. The CD stated that **GODDARD** purported the drugs to be fentanyl.

2

7. On or about November 4, 2019, investigators monitored and recorded a consensual telephone call between the CD and **GODDARD**. Investigators observed as the CD dialed telephone number 704-497-3706. The CD stated this was the number utilized by **GODDARD**. The telephone was placed on speaker phone so investigators could listen live.

8. During the telephone call, **GODDARD** and the CD discussed the marijuana that the CD received from **GODDARD**. **GODDARD** and the CD used the term "trees" to describe marijuana. "Trees" is a term commonly used by drug traffickers to describe marijuana, based on my training, experience, and information provided by the CD. The CD then asked **GODDARD** if he had the "fetty" still. Based on my training and experience, I know "fetty" is a term commonly utilized by drug traffickers to describe the drug fentanyl. **GODDARD** immediately replied "Yea I showed you that!" meaning that **GODDARD** had showed the CD the fentanyl the previous day when the CD was at the **TARGET RESIDENCE**. The CD then asked **GODDARD** what the price of a "whole one" was. "Whole one" is a term commonly utilized by drug traffickers to describe kilogram quantities of drugs. **GODDARD** replied "60 on them," meaning $60,000.00 per kilogram of fentanyl, which investigators know to be a common price per kilogram of fentanyl in the Dayton, Ohio area. The CD and **GODDARD** then agreed to speak at a later time about setting up a transaction.

9. Investigators searched Ohio BMV and open source records for the 1454 Ruskin Road residence and learned that S.B. and **Lionel COMBS** had the 1454 Ruskin Road residence listed as their address. Investigators showed the CD a photograph of **COMBS** and the CD recognized **COMBS** as being present in the 1454 Ruskin Road residence on November 3, 2019, when the CD purchased the marijuana from **GODDARD**. The CD subsequently identified **CORTNER** as being present at the 1454 Ruskin Road residence at the time of the transaction on November 3, 2019, as well. The CD stated that **CORTNER** was wearing a firearm with an extended magazine on his hip at the time of the transaction, and that the firearm appeared to be the same type of firearm that **GODDARD** possessed at the time of the transaction. The CD stated that, at the time of the transaction on November 3, 2019, he saw plastic tubs containing marijuana in the basement area of the residence, as well as a duffel bag containing the suspected fentanyl. The CD stated that the marijuana and fentanyl was located in the open in the basement while **COMBS** and **CORTNER** were present.

10. On November 4, 2019, the Honorable Sharon L. Ovington, United States Magistrate Judge for the Southern District of Ohio, authorized a warrant to search the 1454 Ruskin Road residence.

11. At approximately 6:50 p.m., on November 4, 2019, agents and officers of the DEA and Dayton Police Department executed the search warrant. Agents and officers knocked on the door of the residence and announced their presence. After the knock and announce went unanswered, agents and officers made entry into the residence. Upon entering the residence, a task force officer for the DEA descended a stairway to the basement of the residence. As the task force officer descended the stairway, the task

3

force officer immediately came under gunfire from the basement and was struck by the gunfire.

12. Subsequently, agents and officers secured the residence and found that four individuals were located in the basement of the residence where the gunfire had originated—including **GODDARD**, **CORTNER**, and **COMBS**. Investigators searched the basement of the residence and located approximately nine kilograms of suspected fentanyl, six plastic tubs containing suspected marijuana, a plastic bag containing suspected marijuana, three firearms, a drug press, a money counter, and approximately $50,000 in United States currency, as follows:

   a. Two of the firearms were FN5-7, 5.7 caliber, pistols, both with extended magazines, loaded with armor piercing ammunition, and equipped with laser sights. One of the FN5-7 firearms was located on the floor of the basement. The other FN5-7 firearm was located on the hip of **CORTNER** and subsequently secured by the officers. The third firearm, an AR-style weapon, was located in the storage area underneath the basement staircase.

   b. The plastic totes of suspected marijuana were stacked in the open on the floor along the north wall of the basement, next to a television.

   c. The plastic bag containing suspected marijuana was located on floor of the basement near the west wall.

   d. The nine kilograms of suspected fentanyl were located in a duffel bag in the storage area underneath the basement staircase.

   e. A large amount of U.S. currency was spread out in the open on a coffee table located in front of the television. Bundles of U.S. currency were also located in a duffel bag found in the storage area underneath the basement staircase.

   f. The drug press and money counter were located in the storage area underneath the basement staircase.

13. Following execution of the search warrant, law enforcement conducted interviews of **GODDARD**, **CORTNER**, and **COMBS**. Each interview was recorded and each individual was read their Miranda rights, acknowledged those warnings, and executed written waivers of those rights.

   a. During the interview of **GODDARD**, **GODDARD** stated that the residence is his brother-in-law's home. **GODDARD** stated that the kilograms of suspected fentanyl and containers of suspected marijuana belonged to him. **GODDARD** estimated the quantity of marijuana located in the basement to be 50 to 60 pounds. **GODDARD** stated that the kilograms of suspected fentanyl were cocaine. **GODDARD** stated that the

4

U.S. currency found in the basement belonged to him. **GODDARD** estimated that the U.S. currency found on the table amounted to $10,000 or $11,000, and that the U.S. currency found under the basement staircase amounted to $40,000. **GODDARD** stated that any contraband found in the home was his and not the other individuals. **GODDARD** stated that he heard a boom at the door of the residence so he grabbed his gun, which was laying on the coffee table in the basement. **GODDARD** stated that he positioned himself against the west wall. **GODDARD** stated that he fired two to three times at the individual descending the staircase. **GODDARD** later stated he thought the individuals entering the residence were there to rob him.

b. During the interviews, **CORTNER** stated that he was smoking marijuana in the basement, did not know what was contained in the plastic tubs, and did not know of the suspected fentanyl under the basement staircase. **COMBS** stated that he saw the marijuana in the basement, assumed it was "reefer," that the marijuana was not his and that he had confronted **GODDARD** about the marijuana, and the currency and firearm located on the coffee table.

14. One kilogram of the suspected fentanyl found in the basement was tested by the Miami Valley Regional Crime Laboratory. The kilogram tested positive for cocaine with a weight of approximately 996.4 grams. A second kilogram of the suspected fentanyl was field tested by law enforcement and tested positive for fentanyl with a weight of approximately 1,020.3 grams.

15. Based on the aforementioned, I respectfully submit that there is probable cause to believe that **GODDARD**, committed violations of:

a. 18 U.S.C. §§ 111(a)(1) and (b); and 1114, namely, assaulting a federal officer using a deadly or dangerous weapon and inflicting bodily injury;

b. 21 U.S.C. §§ 846 and 841(b)(1)(A), namely, conspiracy to possess with intent to distribute 400 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled substance, 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, and a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance; and

c. 18 U.S.C. § 924(c)(1), namely, use of a firearm that is discharged in furtherance of a drug trafficking crime.

I submit that there is also probable cause to believe that **CORTNER** and **COMBS** committed violations of:

5

a. 21 U.S.C. §§ 846 and 841(b)(1)(A), namely, conspiracy to possess with intent to distribute 400 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled substance, 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, and a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance; and

b. 18 U.S.C. § 924(c)(1), namely, use of a firearm that is discharged in furtherance of a drug trafficking crime.

_____
Charles A. Vill, Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this 5th day of November, 2019.

_____
Honorable Sharon L. Ovington
United States Magistrate Judge