UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

NATHAN GODDARD, *et al.*,

    Defendants.

Case No. 3:19-cr-171

District Judge Michael J. Newman

---

**ORDER: (1) DENYING DEFENDANTS GODDARD'S AND COMBS'S MOTIONS FOR *FRANKS* HEARINGS (Doc. Nos. 125, 127); (2) DENYING DEFENDANTS GODDARD'S AND COMBS'S MOTIONS TO SUPPRESS (Doc. Nos. 125, 127); (3) DENYING IN PART DEFENDANT CORTNER'S MOTION TO SUPPRESS AS TO WHETHER THE SEARCH WARRANT AFFIDAVITS SHOWED PROBABLE CAUSE (Doc. No. 126); AND (4) AFFIRMING THE NEED FOR THE MAY 24, 2022 EVIDENTIARY HEARING AS TO DEFENDANT CORTNER'S POST-ARREST STATEMENTS**

---

Defendants Nathan Goddard ("Goddard"), Cahke Cortner ("Cortner"), and Lionel Combs, III ("Combs") are charged in an 11-count indictment in connection with the fatal shooting of DEA Task Force Officer and Dayton Police Department Detective Jorge Del Rio ("Detective Del Rio"). *See* Doc. No. 15.  Defendants move to suppress (Doc Nos. 125, 126, 127) the evidence obtained from searches after the police executed the search warrant affidavits at issue (Doc. Nos. 133-2, 134-2, 134-3), and the parties have filed respective memoranda in response to, and in support of, these motions (Doc. Nos. 133, 134, 135, 136, 137).  Goddard and Combs, in their motions, request evidentiary hearings under *Franks v. Delaware*, 438 U.S. 154 (1978).  Doc. No. 125 at PageID 573, 581; Doc. No. 127 at PageID 593, 601.  The Government opposes these requests.  Doc. No. 133 at PageID 638.  Cortner moves to suppress statements allegedly obtained in violation of *Miranda v. Arizona*.  Doc. No. 126 at PageID 583.  He moves for an evidentiary hearing on this

issue, *id.*, which the Government does not oppose, Doc. No. 134 at PageID 668. These motions are ripe for review.

## I.  Facts Alleged in the Three Search Warrant Affidavits

Three search warrant affidavits tell this story of fentanyl trafficking in Dayton, the police officers who investigated it, and Detective Del Rio's death in the line of duty. *See* Doc. Nos. 133-2, 134-2, 134-3.

### A.  Facts Contained in the Ruskin Residence Affidavit

The Dayton Office of the Drug Enforcement Administration ("DEA") tracked a local fentanyl trafficking operation during the fall of 2019. Doc. No. 133-2 at PageID 645–46. A cooperating defendant ("CD") gave DEA agents information about the criminal operation in exchange for leniency on potential drug trafficking charges. *Id.* at PageID 646. CD identified a specific location in Dayton for the DEA to direct their efforts: 1454 Ruskin Road ("the Ruskin residence"). *Id.* Purportedly, on or about November 3, 2019, he bought one pound of marijuana from Goddard in the basement of the Ruskin residence, where he also saw ten kilograms of what Goddard claimed to be fentanyl. *Id.*

CD offered to call Goddard the next day while DEA agents listened in. *Id.* CD gave the agents a phone number that CD claimed "was utilized by Goddard," dialed it, and then placed the call on speaker in their presence. *Id.* During the call, Goddard revealed his role in the trafficking ring by, in part, discussing the marijuana that he sold to CD. *Id.* Goddard referred to "trees," slang for marijuana, and when CD asked what a "whole one"—drug traffickers' slang for a kilogram of drugs—would cost, Goddard answered, "60 on them." *Id.* This, as the first affidavit explains, meant $60,000 was the going price for a kilogram of fentanyl in Dayton. *Id.* CD also asked Goddard if he had "fetty" (*i.e.*, fentanyl) available for sale. *Id.* Goddard replied, "Yea [sic], I showed you that!" *Id.* They ended the call after agreeing to speak later to set up a transaction. *Id.*

at PageID 646–47.

After the call, DEA agents scoured "Ohio BMV [("Bureau of Motor Vehicles")] and open source records[.]" *Id.* at PageID 647. They discovered who listed the Ruskin residence as their home—Combs, who was unknown to the investigators at that time. *Id.* When DEA agents showed Combs's photograph to CD, CD immediately "recognized him as being present" in the Ruskin residence when CD bought marijuana from Goddard. *Id.*

That same day, DEA agents drove CD to the Ruskin residence. *Id.* Sticking to the story, CD identified the Ruskin residence as the location where CD bought marijuana from Goddard and saw fentanyl. *Id.* The agents surveilled the residence that afternoon. *Id.*

They saw one vehicle near the residence with license plates registered to Deangelo Goode. *Id.* Goode was arrested for drug trafficking in 2007. *Id.* CD, after being presented with Goode's photo, also identified him as a local drug distributor. *Id.* Another car parked nearby belonged to John Senter. *Id.* He was known to the DEA agents as a Dayton-area cocaine and marijuana trafficker, who spent six years in federal prison in 2006 for drug dealing. *Id.*

DEA agents summarized what they learned from CD and during their surveillance in an application for a warrant to search the Ruskin residence. *See* Doc. Nos. 133-1, 133-2. The next day, U.S. Magistrate Judge Ovington granted the application and issued a search warrant. Doc. No. 133-1 at PageID 640. DEA agents executed it the same day.

**B.  Facts Contained in the Cellphone Affidavit[1]**

Detective Del Rio led agents into the Ruskin residence. Doc. No. 134-2 at PageID 682. Descending the basement steps, he was struck in the face by gunfire. *Id.* He later succumbed to

---

[1] As mentioned below, *see infra* Part III(B)(2), the facts alleged in the affidavit to search the Ruskin residence were contained in the affidavits to search the cellphones and the Google account associated with one of the cellphones.

3

his injuries. Following the shooting, the police secured Combs, Cortner, and Goddard in the Ruskin residence. *Id.*

Upon resuming their search, officers uncovered contraband. *Id.* Specifically, they recovered several pounds of marijuana; over six kilograms of cocaine and four kilograms of fentanyl; roughly $40,000 in U.S. currency; and three firearms—including the firearm used to shoot Detective Del Rio. *Id.* The police also discovered fourteen cellphones. *Id.*

Federal Bureau of Investigation Special Agent Robert Buzzard ("Agent Buzzard") attested in the affidavit before Judge Ovington that, based on his training and experience, drug traffickers often use multiple cellphones for dealing drugs. *Id.* at PageID 683–85. For instance, a drug dealer may use one phone to chat with customers, while using a separate phone to speak to suppliers. *Id.* at PageID 683. Faced with this information, Judge Ovington granted the application to search the cellphones. *See* Doc. Nos. 134-1, 134-2.

      **C.**    **Facts Contained in the Google Account Affidavit**

After searching one of the phones, the police found it registered to a Google account bearing Cortner's last name. *See* Doc. No. 134-3 at PageID 701. The phone was used to conduct two Google searches for the kilogram-to-pound conversion rate. *Id.* The phone's call log revealed several calls to and from Goddard's phone number. *Id.* Stored text messages displayed coded communications between Cortner and another number discussing the prices of suspected drugs, including fentanyl and cocaine. *Id.* at PageID 701–02.

Defendants challenge these warrants' affidavits for lack of probable cause. All three attack the affidavit for the Ruskin residence, *see* Doc. Nos. 125, 126, 127, but only Cortner targets the affidavits for the cellphones and the Google account, *see* Doc. No. 126.

4

## II. Fourth Amendment Standard

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The Fourth Amendment protects individuals against unreasonable searches and seizures." *United States v. Bateman*, 945 F.3d 997, 1005 (6th Cir. 2019) (citations omitted) (quotation marks omitted) (alteration in original). While the Fourth Amendment "is silent as to the remedy afforded one whose property is searched or seized subject to a warrant lacking probable cause . . . the 'principal judicial remedy' for Fourth Amendment violations" is the exclusionary rule, which "bars courts from allowing unlawfully seized evidence to be used in a criminal trial[.]" *United States v. Elmore*, 18 F.4th 193, 199 (6th Cir. 2021) (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)) (citation omitted).

A defendant may file a pretrial motion asserting a Fourth Amendment violation and seeking suppression of unlawfully seized evidence. *See* Fed. R. Crim. P. 12(b)(3)(C). Defendants carry the burden to show "a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman,* 606 F.2d 673, 679 n.11 (6th Cir. 1979)).

## III. Analysis

Defendants' motions fail for three reasons. First, they are not entitled to *Franks* hearings. Second, the search warrant affidavits here demonstrated probable cause to search the Ruskin residence, the cellphones, and the Google account registered to one of the cellphones. Third, even if the affidavits did not show probable cause, the good faith exception applies.[2]

---

[2] For the purposes of this motion, the Court presumes—without finding—that Goddard has standing to challenge the search. *See* Doc. No. 133 at PageID 627–29 (presenting the Government's argument that Goddard lacks standing to contest the searches); *United States v. Washington*, 573 F.3d 279, 283–86 (6th Cir. 2009); *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000).

### A.     Franks Hearing

"An affidavit supporting a search warrant is presumed valid." *United States v. Fountain*, 643 F. App'x 543, 545 (6th Cir. 2016) (citing *Franks*, 438 U.S. at 171). Under *Franks v. Delaware*, the Court must hold a hearing to probe the veracity of statements made in support of a search warrant when a defendant "1) makes a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit; and 2) proves that the false statement or material omission is necessary to the probable cause finding in the affidavit." *United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013) (citing *Franks*, 438 U.S. at 171–72). Defendants who challenge the existence of probable cause to issue a search warrant usually do "not contest factual issues," but rather dispute the "legal conclusions drawn by the magistrate [judge] from the facts." *United States v. Abboud*, 438 F.3d 554, 577 (6th Cir. 2006). Such defendants are not entitled to evidentiary hearings. *See id.*; *United States v. Lawhorn*, 467 F. App'x 493, 495 (6th Cir. 2012).

Defendants nonetheless argue that they are entitled to evidentiary hearings. Doc. No. 125 at PageID 573, 581; Doc. No. 126 at PageID 583; Doc. No. 127 at PageID 593, 601. But, in the instant case, no one takes aim at specific statements in the affidavits. Instead, they contest only whether the warrants contained probable cause. Doc. No. 125 at PageID 578–81; Doc. No. 126 at PageID 586–90; Doc. No. 127 at PageID 596–601. Because they are not entitled to evidentiary hearings challenging "the legal conclusions drawn by [Magistrate Judge Ovington] from the facts," *Abboud*, 438 F.3d at 577, their motions for *Franks* hearings lack merit.

Because Cortner seeks to suppress statements that he claims the police elicited from him in violation of *Miranda*, there is a need for an evidentiary hearing on that issue, as the Government concedes. Doc. No. 126 at PageID 584–86; Doc. No. 134 at PageID 668; *see also, e.g., Abboud*, 438 F.3d at 574.

6

### B. Probable Cause

"Whether the police had probable cause to search determines whether a search conducted pursuant to a warrant comports with the Fourth Amendment." *United States v. McPhearson*, 469 F.3d 518, 523 (6th Cir. 2006) (first citing *Warden v. Hayden*, 387 U.S. 294, 301–02 (1967); and then citing *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003)). "Probable cause 'is not a high bar.'" *United States v. Sheckles*, 996 F.3d 330, 337 (6th Cir. 2021) (quoting *District of Columbia v. Wesby*, --- U.S. ---, 138 S. Ct. 577, 586 (2018)). All it requires is a "fair probability of criminal activity." *Id.* (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)). Deciding this invokes the "totality of the circumstances" test; do the circumstances, along with "common sense," make it fairly probable that contraband is in the place to be searched? *United States v. Christian*, 925 F.3d 305, 309 (6th Cir. 2019) (en banc) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

This "practical, common sense determination" invokes "certain criteria." *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008). The affidavit supporting the warrant must "state a nexus between the place to be searched and the evidence sought." *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998) (internal quotations omitted). The Court must not "engage in a line-by-line scrutiny of the . . . affidavit." *Williams*, 544 F.3d at 686 (citations omitted). Rather, the Court, upon review, must give "great deference" to the issuing court's "determination of probable cause," *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006) (citing *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc)), and accord "considerable weight" to the officer's conclusion about where evidence will likely "be kept, based on the nature of the crime and type of offense," *Williams*, 544 F.3d at 686 (quoting *United States v. Bethal*, 245 F. App'x 460, 465 (6th Cir. 2007)).

The search warrant affidavits here demonstrated probable cause to believe the Ruskin

7

residence, the cell phones, and the Google account contained evidence of drug trafficking. The totality of the circumstances—CD's firsthand knowledge that Goddard was selling drugs in the Ruskin residence; CD's phone call with Goddard; CD's identification of the Ruskin residence and Combs's presence within; and, *inter alia*, the presence of known drug dealers parked outside— "ma[de] it fairly probable that there w[ould] be additional contraband or evidence of a crime" in the places and items searched. *United States v. Brooks*, 594 F.3d 488, 494 (6th Cir. 2010) (citing *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009)).

### 1. Ruskin Residence Search Warrant

The Ruskin residence affidavit describes the following: (1) CD's purchase on November 3, 2019; (2) CD's phone call with Goddard; (3) CD's identification of the Ruskin residence; (4) CD's recognition of Combs; and (5) the DEA's surveillance of the Ruskin residence, including seeing Senter's and Goode's vehicles. Doc. No. 133-2 at PageID 645–48. Defendants advance several arguments asserting why they contend this affidavit lacked probable cause.

First, they allege the affidavit did not corroborate CD's veracity and reliability. Doc. No. 125 at PageID 575–76; Doc. No. 127 at PageID 597–98. For his part, Combs asserts that CD did not offer enough corroborating details about the drug trafficking taking place in the Ruskin residence. Doc. No. 127 at PageID 598. Nor does the warrant contain a substantial basis for probable cause, according to Goddard. Doc. No. 125 at PageID 578. Goddard analogizes this case to *United States v. Weaver*, 99 F.3d 1372 (6th Cir. 1996), where the Sixth Circuit suppressed evidence when the search warrant affidavit at issue contained largely prewritten boilerplate. The totality of the circumstances contained in this affidavit, however, establishes probable cause.

Begin with the source of the information. Judges "may rely upon information received through an informant" in determining probable cause. *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003) (quoting *Jones v. United States*, 362 U.S. 257, 269–70 (1960), *overruled on other*

*grounds by United States v. Salvucci*, 448 U.S. 83, 100 (1980)). "Informants' tips doubtless come in many shapes and sizes from many different types of persons[,]" *Illinois v. Gates*, 462 U.S. 213, 232 (1983), and "may vary greatly in their value and reliability," *id.* (quoting *Adams v. Williams*, 407 U.S. 143, 147 (1972)). "[A] known informant's statement can support probable cause even though the affidavit fails to provide any additional basis for the known informant's credibility and the informant has never provided information to the police in the past." *United States v. Kinison*, 710 F.3d 678, 682 (6th Cir. 2013) (citing *United States v. Miller*, 314 F.3d 265, 270 (6th Cir. 2002)). In determining whether an informant's account is reliable, no single factor controls and courts concentrate on two prongs: the informant's basis of knowledge and his/her veracity. *See United States v. Smith*, 182 F.3d 473, 478 (6th Cir. 1999); *see also, e.g.*, *United States v. West*, 520 F.3d 604, 609–10 (6th Cir. 2008) (applying the "totality of the circumstances test" to a search warrant affidavit (internal quotations omitted)). A strong showing in one prong can make up for a deficiency in the other. *Gates*, 462 U.S. at 230, 233–35; *see also United States v. Woods*, 858 F. App'x 868, 870 (6th Cir. 2021) ("[A] deficiency in one indicium of reliability may be overcome by pointing to other indicia of reliability").

CD's story was sufficiently credible. "Admissions of crime . . . carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." *United States v. Harris*, 403 U.S. 573, 583 (1971) (plurality opinion); *see also United States v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009) ("[A]n admission against penal interest . . . is a significant, and sometimes conclusive, reason for crediting the statements of an informant" (quoting *Armour v. Salisbury*, 492 F.2d 1032, 1035 (6th Cir. 1974))). A firsthand account, too, bolsters a finding of probable cause. *See Smith*, 182 F.3d at 481–82 (search warrant affidavit's recitation of informant's firsthand knowledge provided a sufficient basis for probable cause). CD admitted to buying narcotics from

9

Goddard at the Ruskin Residence. Doc. No. 133-2 at PageID 646. This was a firsthand account, admitting to a crime—an adequately credible basis of knowledge that supported probable cause. Doc. No. 133-2 at PageID 646; *Id.*; *see also, e.g.*, *Higgins*, 557 F.3d at 390; *Smith*, 182 F.3d at 482; *cf. United States v. Kinison*, 710 F.3d 678, 682–85 (6th Cir. 2013) (cooperating defendant's admission to involvement in child pornography distribution supported probable cause to search another defendant's phone).

Adding this to the DEA's independent verification of CD's story shows that the totality of the circumstances established probable cause for the search. While the affidavit did not specify that CD was reliable, DEA investigators personally corroborated CD's observations. *See* Doc. No. 133-2 at PageID 646–47; *United States v. Dyer*, 580 F.3d 386, 390–91 (6th Cir. 2009) ("While independent corroboration of a confidential informant's story is not a *sine qua non* to a finding of probable cause, in the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration" (quoting *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005))).

The phone call first supported CD's narrative. On the phone, Goddard used drug slang, confirmed that he sold CD marijuana and showed CD fentanyl in the Ruskin residence, and agreed to set up a future deal. Doc. No. 133-2 at PageID 646–47. Thus, Goddard himself corroborated CD's allegations. *See id.* at PageID 646 ("Goddard immediately replied 'Yea I showed you that!' meaning that Goddard had showed [CD] the fentanyl the previous day when [CD] was at the [Ruskin residence]"); *see also United States v. Hammons*, 411 F. App'x 837, 841 (6th Cir. 2011) (probable cause existed to search defendant's residence when police corroborated confidential informant's account that he bought drugs in a house by having him call the drug dealer over the phone).

Beyond this, DEA investigators verified CD's information when they took CD to the Ruskin residence and showed CD Combs's picture. Doc. No. 133-2 at PageID 646–47. CD identified the Ruskin residence and recognized that Combs was present the day of the sale—more proof favoring CD's credibility. *Id.*; *see Hammons*, 411 F. App'x at 841 (having the informant confirm the location where he claims to have bought drugs bolstered probable cause). Observing Senter's and Goode's cars parked outside further confirmed the police's suspicion. Doc. No. 133-2 at PageID 647. While the presence of Senter and Goode alone might be "insufficient" to establish probable cause, considering their past arrests and convictions for drug dealing, this was "not an irrelevant consideration" and added yet another fact favoring the reasonable inference that there was contraband in the Ruskin residence. *United States v. Cupps*, 503 F.2d 277, 281 (6th Cir. 1974).[3] Thus, all these details corroborated CD's account and linked the Ruskin residence to drug trafficking. Coupled with CD's admission, these combined circumstances demonstrated probable cause. *See, e.g.*, *Kinison*, 710 F.3d at 682–85; *Hammons*, 411 F. App'x at 841.

Turning to *Weaver*, Goddard's reliance on it proves misplaced. The search warrant affidavit in *Weaver* merely stated that the informant went to the residence in question, saw some marijuana, and told this to the police. 99 F.3d at 1378. Nowhere did it "corroborate [the] informant's claims," unlike here. *Id.* at 1379. The Ruskin residence affidavit not only included CD's firsthand account but featured Goddard's phone call; showed how CD identified the Ruskin residence as the location of his marijuana purchase and fentanyl sighting (where Combs was also present); and pointed out the vehicles registered to two past drug offenders outside the residence. Doc. No. 133-2 at PageID 646–47; *see also, e.g.*, *Hammons*, 411 F. App'x at 841. These "specific

---

[3] Goddard's reliance on *Cupps*, *see* Doc. No. 125 at PageID 579, for this reason, fails. Unlike *Cupps*, ample facts supported probable cause beyond Senter's and Goode's cars being parked outside the Ruskin residence. *See* Doc. No. 133-2 at PageID 645–47.

11

details" backed up CD's story, as the police "independently confirm[ed]" CD's allegations. *Smith*, 182 F.3d at 484 (Keith, J., concurring).

Still, Combs challenges the search on "nexus" grounds, claiming the police lacked a connection between the contraband sought and the Ruskin residence; rather, he views the facts alleged as germane only to Goddard's drug dealing. Doc. No. 127 at PageID 597–600; Doc. No. 136 at PageID 722–24. True, to search a home, "[t]here must . . . be a 'nexus between the place to be searched and the evidence sought.'" *Carpenter*, 360 F.3d at 594 (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)). But the affidavit here "had to show only a fair probability that evidence of [drug] trafficking would be found at the [Ruskin residence], not that [Combs] was the drug dealer." *United States v. Bell*, --- F. App'x ---, No. 20-1884, 2022 WL 59619, at *4 (6th Cir. Jan. 6, 2022); *see also, e.g.*, *United States v. Miller*, 850 F. App'x 370, 374 (6th Cir. 2021) ("Search warrants are directed at places, not people" (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 555 (1978))). It showed this. *See* Doc. No. 133-2 at PageID 646–47. Considering Goddard confirmed on the phone that he showed CD fentanyl in the basement, this—combined with CD's personal account—substantiated the claim that the Ruskin residence likely contained contraband. *See Dyer*, 580 F.3d at 391–93 (nexus existed between house and drug dealing where confidential informant reported drug dealing firsthand and police corroborated portions of the informant's story); *Bell*, 2022 WL 59619, at *3–5 (same).

Undeterred, Defendants point to other facts they claim were not corroborated, such as whether Goddard was at the Ruskin residence while he spoke to CD over the phone, Doc. No. 127 at PageID 599, and whether the police confirmed that it was Goddard who spoke to CD over the phone, *id.* at PageID 598. They also propose facts they believe the police should have added to the affidavit. *See* Doc. No. 125 at PageID 578–79 (suggesting that the affidavit needed to state if

12

evidence was concealed in the residence, list controlled buys, and document packages delivered); Doc. No. 127 at PageID 598 (arguing that the affidavit needed to state how the drugs were stored). But "[t]he affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000); *cf. Kinison*, 710 F.3d at 683 (police were not required to further corroborate whether text messages between cooperating defendant admitting to a crime and the defendant that the phone number belonged to the defendant). As explained, numerous, corroborated facts in the affidavit showed probable cause. *See* Doc. No. 133-2 at PageID 646–47. The Court turns next to the search warrants for the phones and Google account.

    **2.**  **The Fourteen Phones**

The affidavit for the phones largely mirrored the affidavit for the Ruskin residence. As explained above, there is no remaining question as to the following: (1) CD's reliability and veracity; (2) the police's independent corroboration; and (3) Defendants' objections about what they think the affidavits should have contained. *See supra*, Part III(B)(1). The affidavit for the phones did, however, differ in some notable areas. It discussed CD's account that Combs and Cortner were present during the November 3, 2019 transaction. Doc. No. 134-2 at PageID 681. It also recounted Detective Del Rio's killing, and listed the following items found within: pounds of marijuana, fentanyl, and cocaine; over $40,000 in U.S. currency; and several firearms. *Id.* at PageID 682. Moreover, it contained Agent Buzzard's attestations about drug traffickers' cellphones. *Id.*

Cortner's arguments for suppression of the phone tread familiar ground. Cortner, too, argues that the phone affidavit is insufficient because it does not establish CD's reliability or veracity; it is boilerplate; and it is analogous to *Weaver*. Doc. No. 126 at PageID 587–89. These arguments also fail for the reasons previously stated. *See supra,* Part III(B)(1). Yet unlike

13

Goddard, Cortner contends that the affidavit did not tie probable cause to the phones, since it connected only Goddard to the call with CD.  Doc. No. 135 at PageID 717.

But the phone affidavit connected the fourteen phones to drug dealing.  For a cellphone, "[t]he only probable cause necessary is that the phone itself is being used in connection with an offense or commonly used by someone committing the offense."  *United States v. Sims*, 508 F. App'x 452, 460 (6th Cir. 2012) (citing *United States v. Giacalone*, 853 F.2d 470, 478 (6th Cir. 1988)).  The second affidavit's description of Goddard's phone call with CD provided a reasonable inference that Goddard used at least one phone for this conversation and drug dealing.  *See United States v. Hawkins*, 426 F. Supp. 3d 447, 453–54 (E.D. Mich. 2019) (probable cause existed to search cellphone where drug dealer may have used phone for drug sales).  Agent Buzzard's attestations illustrate that Goddard (because he was arrested in the Ruskin residence) likely used these phones—which were found together with contraband—to communicate with clients, suppliers, and other criminals.  *See* Doc. No. 134-2 at PageID 683–85; *see also Hawkins*, 426 F. Supp. 3d at 453 (information that defendant was involved in selling marijuana coupled with detective's training and experience about how drug traffickers used cellphones provided probable cause to seize the phone).  Combining these circumstances led the police to one, reasonable conclusion: someone in the Ruskin residence used these phones in connection with drug dealing.

This affidavit was as specific, *contra Weaver*, 99 F.3d at 1375–76, as the Ruskin residence affidavit, *see Hammons*, 411 F. App'x at 841.  Ultimately, Goddard's recorded phone call, Agent Buzzard's attestations, Goddard's presence in the house, and the contraband discovered in the house gave probable cause to believe the phone contained evidence of drug trafficking.  *See* Doc. No. 134-2 at PageID 683–85; *Sims*, 508 F. App'x at 460; *Hawkins*, 426 F. Supp. 3d at 453–54. *See generally United States v. Gholston*, 993 F. Supp. 2d 704, 719–20 (E.D. Mich. 2014)

14

(collecting cases where police could infer that a cell phone discovered in relation to drug conspiracies involving multiple actors contained evidence of criminal activity).

### 3. The Google Account

To support suppression of this evidence, Cortner's sole argument is that the allegedly flawed Ruskin residence search warrant taints the Google account search warrant under the fruit of the poisonous tree doctrine. Doc. No. 126 at PageID 589; *see United States v. Galaviz*, 645 F.3d 347, 354 (6th Cir. 2011). Because probable cause supported the warrant to search the Ruskin residence, *see supra* Part III(B)(1)-(2), Cortner's contention lacks merit. Thus, all three search warrant affidavits demonstrated the required probable cause.

### C. Good Faith Exception

Although the three search warrants were valid, supported by probable cause, and withstand Fourth Amendment scrutiny, the Court considers, *arguendo*, whether the good faith exception applies. The good faith exception allows the Court to admit "evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective" despite the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 905 (1984). Because "the exclusionary rule seeks to deter police (not judicial) misconduct[,]" then the Court will not fault an officer who reasonably relies on an issuing court's determination of probable cause. *United States v. Reed*, 993 F.3d 441, 450 (6th Cir. 2021) (citing *Davis v. United States*, 564 U.S. 229, 239 (2011)). However, the good faith exception does not apply in four circumstances:

> (1) when the warrant is issued on the basis of an affidavit that an affiant knows (or is reckless in not knowing) contains false information; (2) when the issuing magistrate abandons his or her neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid.

15

*United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (quotations omitted).

In an attempt to disprove the DEA's good faith reliance, Defendants rely on exception number three, otherwise "known as [the] 'bare bones' affidavit" exception. *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (citing *Weaver*, 99 F.3d at 1380). An affidavit is "bare bones" if it "states only 'suspicions and beliefs without any underlying factual information on the veracity or reliability of the information.'" *Id.* (quoting *Laughton*, 409 F.3d at 748). The good faith exception applies if the affidavit has "any nexus between the residence" and the illegal activity. *Carpenter*, 360 F.3d at 595–96. This nexus exists if "there is 'some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched.'" *Reed*, 993 F.3d at 451 (quoting *United States v. McCoy*, 905 F.3d 409, 418 (6th Cir. 2018)).

The residential search warrant affidavit established such a nexus between the Ruskin residence and drug trafficking. Specific and detailed facts demonstrate this. First, the affidavit laid out CD's purchase of drugs from Goddard in the Ruskin residence. Doc. No. 133-2 at PageID 646; *cf. Reed*, 993 F.3d at 451 (noting "when we have rejected *Leon's* exception in the past, the police generally lacked reliable proof that the defendant was recently (or ever) engaged in drug dealing"). Second, the affidavit narrated Goddard's phone call with CD. Doc. No. 133-2 at PageID 645–46; *see Hammons*, 411 F. App'x at 841–42. Third, the affidavit revealed how the police corroborated CD's statements by surveilling the Ruskin residence, having CD identify the Ruskin residence, and showing CD Combs's photo. Doc. No. 133-2 at PageID 646–47; *see also, e.g.*, *Christian*, 925 F.3d at 313; *Higgins*, 557 F.3d at 391 (good faith exception applied where there was a sufficient link between an informant's claim, earlier that day, to buying drugs from a house and drug activity in that house).

These links in the chain provide a "minimally sufficient nexus" between the Ruskin residence and drug trafficking to trigger the good faith exception. *White*, 874 F.3d at 497; *see also id.* at 498–506 (good faith exception applied to warrant that stated that a confidential informant told the police that the defendant bought drugs from the residence, the police corroborated that tip by conducting a controlled buy at the residence, and the police investigated the defendant's criminal history and connection to the residence). Moreover, the phone calls, CD's acknowledgment of the Ruskin residence, and Combs's presence offered "some additional evidence from which illegal activity inside the residence could be inferred."[4] *Id.* at 509 (Stranch, J., dissenting) (collecting cases).

The same goes for the cellphone warrant. Its supporting affidavit discusses CD's involvement with Goddard, lists the contraband found in the Ruskin residence, and contains Agent Buzzard's attestations about drug traffickers' cellphones. Doc. No. 134-2 at PageID 683–85. No "'simple glance' at the warrant would reveal deficiencies glaring enough to make reliance on it unreasonable." *United States v. Castro*, 881 F.3d 961, 966 (6th Cir. 2018) (citing *United States v. Watson*, 498 F.3d 429, 432 (6th Cir. 2007)). Rather, "an officer could reasonably infer that" Goddard, Combs, Cortner, or any other Ruskin residence occupant "routinely use[d] [these fourteen] cell phones to facilitate their illicit business." *United States v. Merriweather*, 728 F. App'x 498, 505 (6th Cir. 2018) (search was valid under the good faith exception because the affidavit stated that a phone was found near contraband and an officer attested that drug dealers routinely use their phones in furtherance of the drug trade). The affidavit showed as much, since

---

[4] On this basis, Goddard's analogies to various cases where the good faith exception did not apply are inapt. Doc. No. 125 at PageID 580. The ample, corroborated facts in the Ruskin residence affidavit adequately connect Goddard's drug dealing to the residence. *See* Doc. No. 133-2 at PageID 645–48. Namely, the phone call where Goddard discussed the sale in the Ruskin residence and CD's purchase created the minimally sufficient nexus necessary for the good faith exception to apply. *Id.*; *see White*, 874 F.3d at 497.

17

it tied Goddard's drug dealing to the residence. *See, e.g.*, *United States v. Lavallis*, 515 F. Supp. 3d 686, 693–94 (E.D. Mich. 2021) (affidavit for a search warrant for a cellphone met good faith standard where it recounted a controlled buy and listed the attesting officer's training and experiences with drug dealers who use their phones for drug sales).

Moreover, the search warrant for the Google account—since it mirrored the other two warrants—passes the *Leon* threshold for the reasons stated.  Therefore, these three warrants meet the good faith exception were it even necessary.

### IV.

For these reasons, Defendants Goddard and Combs's motions to suppress are both **DENIED**.  Their motions for *Franks* hearings are also **DENIED**.  Defendant Cortner's motion to suppress and for an evidentiary hearing is **DENIED IN PART** as to his challenge of whether the search warrant affidavits[5] demonstrated probable cause.  The Court reserves a ruling on whether to suppress various statements made by Cortner and affirms the need for an evidentiary hearing on this issue.  The evidentiary hearing on **May 24, 2022** will proceed as to Cortner's motion to suppress these statements.

**IT IS SO ORDERED.**

May 18, 2022                                          s/Michael J. Newman
                                                      Hon. Michael J. Newman
                                                      United States District Judge

---

[5] To the extent Cortner has standing, his challenges as to the sufficiency of the search warrant affidavits are **DENIED**.